# Illinois Official Reports

## Appellate Court

*Westlake Financial Group, Inc. v. CDH-Delnor Health System*,
2015 IL App (2d) 140589

| | |
|---|---|
| Appellate Court Caption | WESTLAKE FINANCIAL GROUP, INC., Plaintiff-Appellant, v. CDH-DELNOR HEALTH SYSTEM, f/k/a Delnor Community Health System, Defendant-Appellee. |
| District & No. | Second District<br>Docket No. 2-14-0589 |
| Filed | January 6, 2015 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's dismissal of plaintiff's complaint for breach of contract arising from a brokerage agreement under which defendant hired plaintiff to act as defendant's insurance broker to procure benefits for defendant's employees was reversed, since the trial court erred in determining that a termination clause in a separate contract between the parties permitted defendant to terminate the contract at issue without cause and that plaintiff's damages were barred by a limitation-of-liability clause, especially when the two contracts dealt with different subject matter and the termination clauses did not equally apply to both contracts, and the limitation-of-liability clause barred only consequential damages from lost profits, not direct damages from lost profits. |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 13-L-747; the Hon. Diane E. Winter, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on          Robert S. Reda and Kristina A. McClure, both of Reda & Des Jardins,
Appeal              Ltd., of Lake Forest, for appellant.


                    Alison C. Conlon and Colleen J. Balek, both of Barnes & Thornburg
                    LLP, of Chicago, for appellee.


Panel               JUSTICE SPENCE delivered the judgment of the court, with opinion.
                    Justices McLaren and Hudson concurred in the judgment and opinion.

**OPINION**

¶ 1       Plaintiff, Westlake Financial Group, Inc. (Westlake), appeals from the trial court's dismissal of its amended breach-of-contract complaint against defendant, CDH-Delnor Health System, f/k/a Delnor Community Health System (Delnor). Westlake argues that the trial court erred in ruling that: (1) a termination clause in a separate contract allowed Delnor to terminate the agreement at issue without cause; and (2) all of Westlake's damages were barred under a limitation-of-liability clause. We conclude that, while the contracts should be construed together, their termination clauses do not equally apply to both contracts, which cover different subject matter. We also conclude that the limitation-of-liability clause bars only consequential damages from lost profits and not direct damages from lost profits. We therefore reverse and remand.

¶ 2                                    I. BACKGROUND

¶ 3       Westlake filed its initial complaint on October 2, 2013. The trial court granted Delnor's motion to dismiss the complaint, and Westlake was given leave to amend its complaint. Westlake filed an amended complaint on March 18, 2014, alleging as follows in relevant part. On January 1, 2008, Westlake and Delnor entered into a brokerage agreement (General Service Agreement or GSA) whereby Delnor hired Westlake to, *inter alia*, act as its insurance broker and procure benefits for its employees. Westlake agreed to create and/or provide the following: a confidential and secure website branded and coded for Delnor's employees to manage their healthcare and benefits; use of Westlake's "Online Enrollment System" software through the Delnor website; confidential and secure administration of benefits; a benefit call center; and confidential and secure access to and use of Westlake's "WITS Program," subject to a "WITS Program Service Agreement" (WITS Agreement), through which Delnor employees could track the resolution of issues concerning their individual benefits and claims. In exchange for its services, Westlake would be paid certain

fees and receive certain commissions. The terms of the agreement were to begin on January 1, 2010, and terminate on December 31, 2014.[1]

¶ 4    Westlake further alleged as follows. It performed all of its duties under the General Service Agreement and the WITS Agreement, as well as a "Non-Disclosure Agreement," excepting only performance prevented by Delnor's actions. The termination clause in paragraph 3.2 of the GSA stated:

> "Termination by Delnor. Delnor may terminate this Agreement at any time upon sixty (60) days prior written notice if (i) WestLake[2] is unable to fulfill its responsibilities under this Agreement, or WestLake is otherwise in material breach of any provision of this Agreement, and (ii) Delnor has given WestLake written notice of such failure or breach and WestLake has not cured such deficiency during such sixty (60) day period."

The WITS Agreement also had a termination clause, but its integration clause stated that the termination clause was limited to the WITS Agreement only. On about March 31, 2011, Delnor breached the GSA's termination clause by one or more of the following acts: (1) notifying Westlake in a letter dated April 18, 2011, that it had replaced Westlake as its insurance broker effective March 31, 2011; (2) merging into CDH-Delnor Health System and ceasing to exist as a separate corporate entity; and (3) hiring another company to provide it brokerage services. Delnor confirmed the March breach on December 30, 2011, by discontinuing use of Westlake's brokerage services, switching to another broker, and refusing to make any further payments under the GSA. As a direct result, Westlake suffered the loss of at least 24 months of commissions on benefits as guaranteed by the GSA, leading to damages exceeding $350,000. The costs saved by Westlake in not having to perform the remainder of the agreement were nominal because it had already completed the Delnor website and because Westlake's support center and WITS program were already staffed as fixed costs of Westlake's operations. Alternatively, Westlake lost "the value of creating and providing the Delnor Website and the WITS Service," which Westlake believed exceeded $100,000.

¶ 5    On April 15, 2014, Delnor filed a motion to dismiss the amended complaint under section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2012)). It argued that, based on the GSA's integration clause and the fact that the parties contemporaneously executed both the GSA and the WITS Agreement, the agreements should be read together and thus Delnor properly terminated the GSA by giving Westlake more than 60 days' written notice under the WITS Agreement's termination clause, which stated:

> "Term: Termination. This Agreement will commence on January 1, 2008, and continue for a five year period until December 31, 2012, unless terminated earlier in accordance with this Section 5 of the Agreement [(the same paragraph)]. Either party may terminate this Agreement by written notice if the other party materially defaults in the performance of any of its material duties or obligations hereunder, and such default is not substantially cured within sixty (60) days after written notice from the

---

[1] The GSA actually stated that it was effective through December 31, 2012, as Westlake acknowledges in its brief's statement of facts.

[2] The contract refers to Westlake as "WestLake," but we use the spelling Westlake applies to itself in its briefs.

other party describing the material default. *Either party may terminate this Agreement for any reason by providing sixty (60) days prior written notice to the other party.*" (Emphasis added.)

Delnor alternatively argued that Westlake could not recover for breach of contract because its damages claim was uncertain, speculative, and limited by the GSA's clear language.

¶ 6 The trial court granted Delnor's motion to dismiss on May 21, 2014. The trial court found as follows. The GSA and the WITS Agreement were to be read together, as they were executed at the same time and by the same parties as part of the same transaction. Further, the agreements' termination clauses were not inconsistent or contradictory. Delnor was allowed to terminate the contracts without cause by giving at least 60 days' notice to Westlake. Moreover, Westlake failed to sufficiently allege its damages, as lost profits were not recoverable under the GSA's limitation-of-liability clause.

¶ 7 Westlake timely appealed.

¶ 8                                                    II. ANALYSIS
¶ 9                                              A. Standard of Review
¶ 10 On appeal, Westlake argues that the trial court erred in granting Delnor's motion to dismiss under section 2-615 of the Code. A section 2-615 motion to dismiss attacks the legal sufficiency of the complaint. *DeHart v. DeHart*, 2013 IL 114137, ¶ 18. In ruling on a section 2-615 motion, a court must accept as true all well-pleaded facts in the complaint as well as all reasonable inferences. *Id.* A cause of action should not be dismissed under section 2-615 unless no set of facts can be proved entitling the plaintiff to recover. *Id.* The central inquiry is whether the allegations, when construed in the light most favorable to the plaintiff, sufficiently state a cause of action upon which relief can be granted. *Id.* We review *de novo* an order granting a section 2-615 motion to dismiss. *Id.*

¶ 11 This case also involves the interpretation of contracts. In construing a contract, the primary objective is to give effect to the parties' intent, and we will first look to the contract's language to determine that intent. *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011). We construe a contract as a whole, viewing each provision in light of other provisions. *Id.* If the contract's words are clear and unambiguous, they will be given their plain, ordinary, and popular meaning. *Id.* We review a contract's interpretation *de novo*. *Carr v. Gateway, Inc.*, 241 Ill. 2d 15, 20 (2011).

¶ 12                                           B. Termination Clauses
¶ 13 Westlake notes that, in Delnor's April 18, 2011, letter, Delnor stated that effective March 31, 2011, Delnor Community Health System officially merged with Central Du Page Health to form a new, yet-to-be-named health system. The letter stated that the new health system had "engaged Towers Watson to facilitate and serve as Broker of Record for the benefits integration process from this date forward." The letter stated that any changes to the existing program, including vendor relationships, would become effective January 1, 2012. Westlake argues that the merger with another company, under which Delnor Community Health System ceased to exist, and the replacement of Westlake with Towers Watson as broker of record breached paragraph 3.2 of the GSA.

¶ 14    As Westlake recognizes, Delnor does not argue that the termination was proper under paragraph 3.2 of the GSA, under which there must have been a material breach with notice and a 60-day opportunity to cure. Rather, Delnor relies on paragraph 5 of the WITS Agreement, which allows termination with or without cause with 60 days' notice. The issue is whether the termination clause in the WITS Agreement also applies to the GSA.

¶ 15    Westlake points out that Delnor relied on *Tepfer v. Deerfield Savings & Loan Ass'n*, 118 Ill. App. 3d 77 (1983), among other cases, in the trial court. There, the court stated: "The general rule is that *in the absence of evidence of a contrary intention*, where two or more instruments are executed by the same contracting parties in the course of the same transaction, the instruments will be considered together and construed with reference to one another because they are, in the eyes of the law, one contract." (Emphasis added.) *Id.* at 80. Westlake argues that the crucial point here is that the instruments must not disclose a contrary intention. Westlake notes that the *Tepfer* court stated that, where separate documents are executed as part of a mortgage transaction, a stipulation or condition in one but not the other is an effective part of the parties' contract, as long as there is no necessary inconsistency. *Id.* at 81. Westlake maintains that, if there is an inconsistency or contrary intention in the documents, the limiting term will be given effect, as shown by the *Tepfer* court's statement that "[c]onstruing contemporaneous instruments together means simply that if there are any provisions in one instrument limiting, explaining, or otherwise affecting the provisions of another, they will be given effect." *Id.* at 80.

¶ 16    Westlake argues that the two instruments here disclose obvious and contrary intentions of the parties, as the GSA requires a material breach, notice, and a 60-day opportunity to cure, whereas the WITS Agreement is much broader, allowing termination with or without cause. Westlake argues that under *Tepfer* the court must give effect to the limiting termination clause in the GSA and Delnor cannot rely on the unrestricted clause in the WITS Agreement. Westlake argues that to reject the GSA's limitations on termination would also violate the principle that a court will not interpret a contract in a manner that would nullify provisions or render them meaningless. See *Thompson*, 241 Ill. 2d at 442.

¶ 17    Westlake additionally argues that Delnor cannot rely on the contracts' integration clauses to support dismissal. Westlake argues that an integration clause is intended to prevent parties from using parol evidence outside of the four corners of a contract (see *W.W. Vincent & Co. v. First Colony Life Insurance Co.*, 351 Ill. App. 3d 752, 758 (2004) (where contract contains an integration clause, the court will not consider parol evidence of prior negotiations to create an extrinsic ambiguity)), but that here the two termination clauses are inconsistent on their face.

¶ 18    The GSA's integration clause states, in pertinent part:

> "Entire Agreement. This Agreement is the complete and exclusive agreement between the parties with respect to the subject matter hereof, superseding and replacing any and all prior agreements, communication, and understandings (both written and oral) regarding such subject matter *except for (i) that certain WITS Program Service Agreement* dates as of an even date herewith by and between WestLake and Delnor and (ii) that certain Mutual NonDisclosure Agreement dates as of an even date herewith by and between WestLake and Delnor. This Agreement may be modified, or any rights under it waived, only by a written document executed by

both parties. This Agreement may be executed in any number of counterparts, all of which taken together shall construe a single instrument." (Emphasis added.)

The WITS Agreement's integration clause states:

"<u>Entire Agreement.</u> This Agreement is the complete and exclusive agreement between the parties with respect to the subject matter hereof, superseding and replacing any and all prior agreements, communication, and understandings (both written and oral) *regarding such subject matter*. This Agreement may be modified, or any rights under it waived, only by a written document executed by both parties. This Agreement may be executed in any number of counterparts, all of which taken together shall construe a single instrument." (Emphasis added.)

¶ 19    Westlake argues that the WITS Agreement's integration clause shows that the parties clearly intended its provisions to apply only to the subject matter therein. According to Westlake, the integration clauses do not allow Delnor to use the broad termination language from the WITS Agreement to override the parties' clear intent to restrict the termination of the GSA to material breaches, with notice and a 60-day opportunity to cure.

¶ 20    For its part, Delnor argues that the GSA and the WITS Agreement must be construed together as one agreement because (1) the GSA specifically incorporates the WITS Agreement, and (2) the agreements were executed simultaneously by the same parties as part of the same transaction. Regarding contractual language, Delnor notes that the GSA states that it incorporates the WITS Agreement, as follows:

"*WITS Service*. WestLake shall allow the Delnor employees to participate in, access, and use the WestLake Issue Tracking System (the 'WITS Program'), as further described in, *and on the terms and conditions set forth in the WITS Program Service Agreement*. A copy of the WITS Program Service Agreement between WestLake and Delnor is attached hereto as Exhibit B and *incorporated herein by reference*." (Emphases added.)

Delnor cites *Wilson v. Wilson*, 217 Ill. App. 3d 844, 853 (1991), where the court stated that, if a contract shows an intent to incorporate another document by reference, the "additional provisions become as much a part of the contract as if they were expressly written in it." Delnor also argues that the GSA's integration clause confirms the parties' intent to incorporate the WITS Agreement's terms into the GSA, because the integration clause explicitly excludes the WITS Agreement from its statement that its provisions represent the entire agreement. *Cf. W.W. Vincent & Co.*, 351 Ill. App. 3d at 758-59 (where integration clause referenced other documents as part of the main agreement, it was apparent that the parties intended that their agreement include the subject matter of the additional documents).

¶ 21    Regarding the timing of the transaction, Delnor argues that the parties executed the GSA and the WITS agreement at the same time, through the same representatives, and as part of the same transaction to provide insurance brokerage services. Therefore, according to Delnor, the contracts must be construed together in their entirety. *Cf. In re Estate of Mayfield*, 288 Ill. App. 3d 534, 541 (1997) (where two or more instruments are executed by the same parties as part of the same transaction, they will be considered together and construed with reference to one another because the law views them as one contract).

¶ 22    We agree with Delnor that the GSA's language shows that the parties intended that it be construed together with the WITS Agreement, as the aforementioned language in the GSA

expressly incorporates the WITS Agreement and the GSA integration clause states that it contains the entire agreement but explicitly makes an exception for the WITS Agreement. Based on this express intention, we do not need to reach the issue of whether the timing of the transaction and the content of the documents would independently allow the documents to be construed together. For this reason, Westlake's arguments based on *Tepfer* are unavailing, as the contracts in that case did not contain the same explicit incorporation provisions present here. Even otherwise, *Tepfer* stated that, where there is no "contrary intention," documents signed at the same time by the same parties as part of the same transaction would be construed together (*Tepfer*, 118 Ill. App. 3d at 80), and here the parties' clear intention through their express language was that the agreements be construed together.

¶ 23    Although we agree with Delnor that the parties intended that the GSA and the WITS Agreement be construed together, that intention does not establish that the WITS Agreement's termination clause serves as a means to terminate the GSA. Westlake argues that the termination provisions cannot overlap because they are inconsistent, in that the GSA requires a material breach, notice, and a 60-day opportunity to cure, whereas the WITS Agreement is much broader, allowing termination with or without cause.

¶ 24    Indeed, the principle that the agreements should be "considered together and construed with reference to one another" (*id.*) does not mean that provisions relating to one subject automatically apply to every subject. The parties chose to make the WITS Agreement a separate document, attached as an exhibit to the GSA. The GSA provision incorporating the WITS Agreement specifically refers to the terms and conditions set forth in that agreement as governing the WITS service, rather than the parties' entire agreement. See 11 Richard A. Lord, Williston on Contracts § 30:25 (4th ed. 2014) ("[W]hen incorporated matter is referred to for a specific purpose only, it becomes a part of the contract for that purpose only, and should be treated as irrelevant for all other purposes.").

¶ 25    Also, as Westlake points out, the WITS Agreement's integration clause states that the agreement is the entire agreement between the parties with respect to its "subject matter." That subject matter is exclusively Delnor's use of Westlake's issue-tracking system, while the GSA's subject matter is Westlake's serving as insurance broker for Delnor's employees. In this manner, this situation is distinguishable from the cases relied on by Delnor, as the multiple contracts in those cases referred to exactly the same subject matter. See *In re Estate of Mayfield*, 288 Ill. App. 3d at 536-37 (involving original and supplemental agreements); *Wilson*, 217 Ill. App. 3d at 846-48 (involving original and restated agreements). We agree with Westlake's argument that, logically, Delnor could terminate the WITS Agreement at any time without interrupting employee access to insurance benefits under the GSA.

¶ 26    Construing the plain language of both agreements as a whole, we conclude that the WITS Agreement's termination provision does not apply to the GSA. Such an interpretation is consistent with the principle that when possible a court should give meaning and effect to every provision and not nullify provisions or render them meaningless (see *Board of Managers of Hidden Lake Townhome Owners Ass'n v. Green Trails Improvement Ass'n*, 404 Ill. App. 3d 184, 190 (2010)), in that it is the only interpretation that gives effect to the parties' stated intentions in both agreements. In other words, the parties chose to include different termination language in the WITS Agreement and the GSA, and the aforementioned interpretation gives effect to the distinction. As such, the trial court erred in granting the

section 2-615 motion to dismiss on the basis that the without-cause termination provision in the WITS Agreement applied to the GSA as well.

¶ 27                                          C. Damages

¶ 28                               1. Limitation-of-Liability Clause

¶ 29        The trial court also granted the section 2-615 motion to dismiss on the alternative basis that Westlake failed to adequately allege damages. The trial court reasoned that lost profits were not recoverable under the GSA's limitation-of-liability clause, which states:

> "<u>Limitation of Liability</u>. Except with respect to the indemnification and confidentiality obligations contained in this Agreement or any Exhibit hereunder, without limitation to the foregoing, under no circumstances shall either party be liable to the other party for any *indirect, incidental, consequential, special, punitive or exemplary damages*, even if either party has been advised of the possibility of such damages, arising from this Agreement, *such as, but not limited to, loss of revenue or anticipated profits or lost business*." (Emphases added.)

¶ 30        Contract damages are measured by the amount of money needed to place the plaintiff in the same position as if the contract had been performed. *In re Illinois Bell Telephone Link-Up II & Late Charge Litigation*, 2013 IL App (1st) 113349, ¶ 19. Clauses limiting damages are enforced due to the strong public policy favoring freedom of contract, but such clauses are not favored and will be strictly construed against a benefitting party. *Hicks v. Airborne Express, Inc.*, 367 Ill. App. 3d 1005, 1011 (2006). Damages are an essential element of a breach-of-contract claim, so a plaintiff's failure to prove damages entitles the defendant to judgment as a matter of law. *In re Illinois Bell Telephone Link-Up II*, 2013 IL App (1st) 113349, ¶ 19; see also *Palmolive Tower Condominiums, LLC v. Simon*, 409 Ill. App. 3d 539, 547 (2011) (affirming trial court's dismissal of counterclaims for failing to sufficiently allege damages).

¶ 31        Westlake notes that there is a distinction between direct damages and consequential damages. "Direct damages," also called "general damages," are "[d]amages that the law presumes follow the type of wrong complained of." Black's Law Dictionary 394 (7th ed. 1999). "Consequential damages" are losses or injuries that do not flow directly and immediately from a party's wrongful act but rather result indirectly from the act. *Hartford Accident & Indemnity Co. v. Case Foundation Co.*, 10 Ill. App. 3d 115, 124 (1973); Black's Law Dictionary 394 (7th ed. 1999); see also 24 Richard A. Lord, Williston on Contracts § 64:12 (4th ed. 2014) (general damages are those that naturally flow from the breach while consequential damages were not the invariable result of such a breach but were reasonably foreseeable or contemplated by the parties as a probable result of a breach when the contract was entered).

¶ 32        Westlake further notes that lost profits can be categorized as either direct or consequential damages, depending on the situation. For example, in *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill. 2d 306, 319 (1987), the supreme court stated that, as a matter of law, the plaintiff's lost profits from the defendant's breach of an oral contract to properly include it in the first issue of a newly published telephone directory were a direct result of the defendant's breach. On the other hand, lost profits were deemed consequential

damages in *Burrus v. Itek Corp.*, 46 Ill. App. 3d 350, 358 (1977) (consequential damages incurred where defective printing press caused decrease in output).

¶ 33 Delnor argues that there is no distinction in Illinois between direct and consequential lost profits and that lost profits can form only consequential damages. It argues that *Midland Hotel Corp.* is inapposite because that case involved an oral contract without a limitation-of-liability clause. While we agree that the types of contracts involved are distinguishable, *Midland Hotel Corp.*, 118 Ill. 2d at 319, clearly held that the lost profits were a direct result of the defendant's breach of contract, thus supporting the proposition that lost profits can be labeled as direct damages in some circumstances.

¶ 34 Having determined that lost profits can be categorized as either direct or indirect damages, depending on the situation, we turn to the issue of whether the GSA's limitation-of-liability clause excluded *any* damages from lost profits. Westlake argues that the ordinary and customary meaning of the phrase "such as, but not limited to," which is contained in the clause, is "for example." We agree that this is the plain meaning of the phrase. *Cf. People v. Greene*, 96 Ill. 2d 334, 339 (1983) (phrase " 'such as, but not limited to' " provided guidance on the kinds of explosive devices prohibited by a statute).

¶ 35 Westlake argues that, while there is no Illinois authority directly on point regarding the language contained in the limitation-of-liability clause, cases in other jurisdictions show that the clause should be interpreted to prohibit only indirect damages from lost profits and allow direct damages from lost profits. Westlake first cites cases with the phrase "including, but not limited to," which Westlake maintains is analogous. In *Penncro Associates, Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1156 (10th Cir. 2007), the court stated that direct damages were the benefit of the bargain that the party lost from the contract itself, while consequential damages were economic harm beyond the contract's immediate scope. The contract at issue prohibited the recovery of " 'consequential damages,' specifying that they 'include, but are not limited to, lost profits, lost revenues and lost business opportunities.' " *Id.* at 1155-56. The defendant argued that the language meant that any lost profits were consequential damages and thus prohibited. *Id.* at 1156. The Tenth Circuit rejected this argument, stating that the "more general term informs the subsequently listed examples, not the other way around, and so lost profits here refer only to those that are 'a part or component' of the larger group or class of consequential damages." *Id.* It concluded that the language barred the recovery of only consequential lost profits, not direct lost profits. *Id.* Specifically, it stated: "We hold that, in keeping with plain meaning and legal norms, where parties to an agreement exclude liability only for consequential damages, profits lost as a direct result of a breach may be recovered." *Id.* at 1162.

¶ 36 Westlake also cites other cases applying analogous reasoning to clauses containing similar language. See *In re First Magnus Financial Corp.*, No. AZ-10-1006-JuMkKi, 2010 WL 6452904, at *6 (B.A.P. 9th Cir. Aug. 31, 2010) (limitation clause prohibiting consequential damages including lost profits did not apply to direct loss of anticipated profits arising from the debtor's breach of contract); *Peter Kiewit Sons' Inc. v. ATSER, LP*, No. 8CV541, 2010 WL 1417811, at *3 (D. Neb. Apr. 1, 2010) (lost profits and lost revenue were not, by definition, consequential damages); *Claredi Corp. v. SeeBeyond Technology Corp.*, No. 4:04CV1304 RWS, 2010 WL 1257946, at *6 (E.D. Mo. Mar. 26, 2010) (plain reading of limitation clause limited only indirect loss of profits and not profits that were direct damages).

¶ 37        Westlake argues that the same result has been reached with another analogous term, "including, without limitation." Westlake cites *Optimal Interiors, LLC v. HON Co.*, 774 F. Supp. 2d 993 (S.D. Iowa 2011). There, the contract stated that there would be no liability for " 'SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES INCLUDING, WITHOUT LIMITATION, LOST PROFITS OR REVENUES.' " (Emphasis omitted.) *Id.* at 1008. The court stated that lost profits or revenues as used in the clause were illustrative of the types of special, incidental, or consequential damages that were disclaimed, and that the clause did not preclude the recovery of direct lost profits. *Id.* at 1010.

¶ 38        Westlake argues that the above examples are readily distinguishable from the contract language found in *Quicksilver Resources, Inc. v. Eagle Drilling, L.L.C.*, No. H-08-868, 2009 WL 1312598, at *5 (S.D. Tex. May 8, 2009), which stated that the parties would hold each other harmless for special, indirect, or consequential damages, which " 'shall be deemed to include, without limitation, the following: loss of profit or revenue.' " The court distinguished that language from the phrase " 'includ[ing], but *** not limited to, lost profits,' " which it stated implied that other, unlisted damages also might be consequential damages. (Emphasis omitted.) *Id.* at *6-7. The court stated that, in contrast, the agreement before it "manifest[ed] a clear intent by the parties to modify the legal meaning and breadth of the term 'consequential damages,' " such that the specifically enumerated types of damages were barred from recovery. *Id.* at *7.

¶ 39        Delnor counters that *Reuben H. Donnelley Corp. v. Krasny Supply Co.*, 227 Ill. App. 3d 414 (1991), controls here. In that case, the plaintiff sued the defendant for failing to pay the cost of an advertisement it placed in the plaintiff's telephone yellow pages directory. The defendant filed a counterclaim for consequential damages from lost profits on the basis that the plaintiff had erroneously printed the advertisement with the phone number of the defendant's competitor. The contract contained an exculpatory clause stating that the plaintiff "[u]nder no circumstances shall *** be liable for special consequential or exemplary damages." (Internal quotation marks omitted.) *Id.* at 417. The trial court ruled that the clause barred the counterclaim, and it entered partial summary judgment for the plaintiff. *Id.* at 416. The appellate court agreed with the trial court's reasoning and affirmed. *Id.* at 421.

¶ 40        Delnor argues that it agreed to pay commissions to Westlake under the GSA and that the lost commissions Westlake now seeks are considered lost profits under Illinois law. See *Equity Insurance Managers of Illinois, LLC v. McNichols*, 324 Ill. App. 3d 830, 837 (2001) (equating lost commissions to lost profits). Delnor argues that, as in *Reuben H. Donnelley Corp.*, the limitation-of-liability clause plainly shows the parties' intent to bar the recovery of lost profits.

¶ 41        As for the federal cases relied on by Westlake, Delnor points out that lower federal court decisions are not binding on Illinois courts. See *Wilson v. County of Cook*, 2012 IL 112026, ¶ 30. Delnor also argues that Westlake's reliance ignores the GSA's plain language in favor of cases involving very different circumstances and very different state laws. It contends that, even if we were to consider the cases persuasive, each is distinguishable in that: (1) *Penncro Associates, Inc.*, 499 F.3d 1151, and *In re First Magnus Financial Corp.*, 2010 WL 6452904, each involved a party's promise to pay fixed minimums during the contract term, the loss of which the court construed as direct damages, but here there were no fixed minimums or guaranteed commissions; (2) the court in *Claredi Corp.*, 2010 WL 1257946, held that lost profits may be direct damages under California law, but there was a question of fact about

damages; (3) in *Peter Kiewit Sons' Inc.*, 2010 WL 1417811, the court allowed the plaintiff to present to the jury its theory that lost profits were direct damages, but the actual language of the clause was not fully recited in the opinion; and (4) in *Optimal Interiors, LLC*, 774 F. Supp. 2d 993, the court ultimately characterized lost profits as consequential or indirect damages.

¶ 42    Delnor argues that *Quicksilver Resources*, 2009 WL 1312598, is the most factually analogous case. Delnor maintains that here, as in *Quicksilver Resources*, the parties agreed to a broadly worded limitation-of-liability clause that included all "loss of revenue or anticipated profits or lost business" as consequential damages. Delnor argues that, regardless of whether the result of the clause seems harsh, Westlake accepted the risk by preparing and executing the agreements.

¶ 43    Again, the GSA's limitation-of-liability clause states that neither party shall "be liable to the other party for any *indirect, incidental, consequential, special, punitive or exemplary damages*, even if either party has been advised of the possibility of such damages, arising from this Agreement, *such as, but not limited to, loss of revenue or anticipated profits or lost business*." (Emphases added.) As stated, we agree with Westlake that the plain meaning of the phrase "such as, but not limited to," is "for example." *Supra* ¶ 34. We further agree with the reasoning in the federal cases that Westlake cites, which construe similar language as prohibiting damages for consequential or indirect lost profits but not direct lost profits. While cases from lower federal courts are not binding, we may consider them as persuasive authority. *Wilson*, 2012 IL 112026, ¶ 30.

¶ 44    Delnor's attempts to distinguish these cases fall flat. Contrary to Delnor's argument, *Peter Kiewit Sons' Inc.* did include the agreement's language, in a footnote; the agreement stated that the parties would not "be liable for consequential, incidental, indirect or special damages, including but not limited to lost profits," which is similar to the language at issue here. *Peter Kiewit Sons' Inc.*, 2010 WL 1417811, at *3 n.1. Regarding the remaining cases, Delnor largely focuses on the courts' ultimate conclusions as to whether the plaintiffs proved that they suffered lost profits as direct damages. Such an inquiry is premature here, as the trial court dismissed the amended complaint on the basis that the limitation clause barred *any* damages from lost profits. We recognize that in *Optimal Interiors, LLC*, 774 F. Supp. 2d at 1012-13, the court ultimately determined that Iowa law categorized all lost profits as consequential damages, but the same is not true in Illinois. See *Midland Hotel Corp.*, 118 Ill. 2d at 319.

¶ 45    We also find without merit Delnor's argument that this case is most akin to *Quicksilver Resources*, 2009 WL 1312598, at *5, as the language there stated that the parties would hold each other harmless for special, indirect, or consequential damages, which " 'shall be deemed to include, *without limitation*, the following: loss of profit or revenue.' " (Emphasis added.) The "without limitation" language is not present here, and not all courts even agree with the interpretation there. See, *e.g.*, *Optimal Interiors, LLC*, 774 F. Supp. 2d at 1010 (disagreeing with *Quicksilver Resources* and stating that there is no material distinction between the phrases "including, but are not limited to" and "includ[ing], without limitation"); *cf. Gardensensor, Inc. v. Stanley Black & Decker, Inc.*, No. 12-CV-03922 NC, 2014 WL 4764628, at *2 (N.D. Cal. Sept. 24, 2014) (clause precluding liability for indirect damages, "including without limitation" lost profits, did not bar recovery of direct damages for lost profits). Delnor's reliance on *Reuben H. Donnelley Corp.*, 227 Ill. App. 3d at 416, also does

not change our result, as the party there sought only consequential damages in the first place.[3]

¶ 46 The plain language of the GSA's limitation-of-liability clause bars "indirect, incidental, consequential, special, punitive or exemplary damages," and it provides examples of subcategories of these groups, like lost profits. As in *Penncro Associates, Inc.*, 499 F.3d at 1156, the "more general term informs the subsequently listed examples, not the other way around, and so lost profits here refer only to those that are 'a part or component' of the larger group or class of consequential damages." Therefore, the limitation-of-liability clause does not bar direct damages from lost profits, which are, at a minimum, arguably present here, so the trial court erred in relying on the clause as an alternative basis to grant the section 2-615 motion to dismiss.

¶ 47                                   2. Term of Damages

¶ 48 Implicitly recognizing that we may affirm the trial court's judgment on any basis provided by the record, regardless of whether the trial court relied on that basis or whether its reasoning was correct (*Bjorkstam v. MPC Products Corp.*, 2014 IL App (1st) 133710, ¶ 23), Delnor argues that, even if the limitation-of-liability clause is inapplicable, Westlake's request for 24 months of commissions is not supported by the agreements as a matter of law, because the unambiguous termination letter and a confirmation e-mail demonstrate that the termination was effective January 1, 2012. Therefore, argues Delnor, when it terminated Westlake effective January 1, 2012, only one more year remained under the five-year contract. However, as stated, a cause of action should not be dismissed under section 2-615 unless no set of facts can be proved entitling the plaintiff to recover. *DeHart*, 2013 IL 114137, ¶ 18. Therefore, even if Westlake miscalculated the exact timeframe for which it could obtain damages, it would not serve as a basis for a section 2-615 dismissal, as dismissal would be appropriate on this basis only if no damages could be proven.

¶ 49                           3. Whether Damages Are Speculative

¶ 50 Delnor additionally argues that dismissal under section 2-615 is proper because Westlake's alleged damages are highly speculative based on the agreements' language. Delnor argues that it did not promise or guarantee any minimum number of commissions to Westlake and that Westlake bore the clear contractual risk of receiving no commissions during any year when the agreements were in effect. Delnor argues that, recognizing this risk, Westlake included in the GSA a clause stating that, if the number of transactions became too low, Westlake had a right to terminate the agreement.[4] Delnor maintains that, as

---

[3]We similarly find *Lockwood v. Standard & Poor's Corp.*, 289 Ill. App. 3d 194 (1997), a case not cited by either party, distinguishable. There, the court, which was applying New York law, stated, in *dicta*, that the contract precluded "recovery of consequential damages, including lost profits, arising out of the license agreement." *Id.* at 198-99. However, the plaintiff was seeking lost profits due to the defendant's alleged failure to correct a closing stock index value (*id.* at 195), which would necessarily be categorized as consequential profits, unlike the profits from commissions arising out of the contract at issue here.

[4]The referenced clause in the GSA provides, in relevant part, "WestLake may also terminate this Agreement at any time upon sixty (60) days written notice if Delnor fails to continue or materially

a matter of law, based on the contract language, Westlake had no expectation of future commissions.

¶ 51　　"Damages are speculative when uncertainty exists as to the fact of their existence" (*Thornhill v. Midwest Physician Center of Orland Park*, 337 Ill. App. 3d 1034, 1051 (2003)), as opposed to the amount of damages (*Goran v. Glieberman*, 276 Ill. App. 3d 590, 595 (1995)). Lost profits by their nature cannot be calculated with mathematical precision and therefore do not have to be proven with absolute certainty; instead, the evidence needs to provide only a reasonable basis for the computation of damages. *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 361 (2002). To allow defendants to escape liability because the amount of damages they have caused is uncertain would immunize the defendants from the consequences of their wrongful conduct. *Id.*

¶ 52　　Relevant to our analysis is *Kay v. Prolix Packaging, Inc.*, 2013 IL App (1st) 112455, ¶ 34. There, the court held that a salesperson's estimation of his damages from unpaid commissions did not amount to speculation and conjecture, but rather constituted reasonable inferences based on his personal knowledge and sales numbers from the relevant time period. The court stated that the sufficiency of the evidence of damages went to the weight of the salesperson's testimony but not its admissibility. *Id. Kay* is distinguishable from this case in that the salesperson there was seeking damages from past commissions that he was allegedly owed but did not receive, not lost profits from future commissions. However, *Kay*'s reasoning still applies, as Westlake had been receiving commissions from Delnor for the previous four years and therefore had a concrete basis on which to estimate how much it would have received in commissions for the fifth year. Any shortcomings in its estimates would go to the weight to be given to the evidence of damages rather than its admissibility. Accordingly, Westlake's alleged damages were not speculative as a matter of law, and this argument does not support the grant of the section 2-615 motion to dismiss.

¶ 53　　Delnor argues that, even if Westlake could reasonably allege its right to recover some lost profits, Westlake impermissibly claims that any costs saved from not performing are nominal, already incurred, or fixed. Delnor cites *S.A. Maxwell Co. v. DeSoto, Inc.*, 73 Ill. App. 3d 844, 850 (1979), for the proposition that a party cannot simply recover gross profits but must deduct all costs saved from nonperformance. However, we have already determined that Westlake's damages are not speculative as a matter of law and that disagreements about the amount of damages cannot serve as a basis for dismissal. See *Dienstag v. Margolies*, 396 Ill. App. 3d 25, 36 (2009) (determining the amount of damages is a function reserved for the trier of fact); *cf. Anzalone v. Kragness*, 356 Ill. App. 3d 365, 372 (2005) (it is not appropriate to dismiss a complaint under section 2-615 simply because the plaintiff's prayer for relief was deemed extravagant).

¶ 54　　　　　　　　　4. Damages as Quasi-Contractual

¶ 55　　Last, Delnor argues that Westlake improperly seeks quasi-contractual damages in its alternative allegation that it lost the value of creating the Delnor website. Delnor argues that Westlake cannot pursue this theory of recovery because Westlake has already conceded that there was a valid contract between the parties. Delnor cites *Barry Mogul & Associates, Inc. v.*

reduces its coverage under or the service purchased from WestLake under the Covered Benefits Program."

*Terrestris Development Co.*, 267 Ill. App. 3d 742, 750 (1994), where the court stated that, in general, a plaintiff cannot pursue a quasi-contractual claim where the parties have an enforceable express contract. Westlake disputes that its alternative theory seeks quasi-contractual relief. We need not resolve this issue, because we have already determined that Westlake has sufficiently alleged damages from lost profits. Therefore, even if Westlake is improperly seeking quasi-contractual damages in its alternative theory, it would not justify dismissing Westlake's amended complaint under section 2-615.

¶ 56                                III. CONCLUSION

¶ 57        For the reasons stated, we reverse the judgment of the Lake County circuit court granting Delnor's section 2-615 motion to dismiss, and we remand the cause for further proceedings consistent with this opinion.

¶ 58        Reversed and remanded.