# Illinois Official Reports

## Appellate Court

---

*AMA Realty Group of Illinois v. Melvin M. Kaplan Realty, Inc.*,
2015 IL App (1st) 143600

---

| | |
|---|---|
| Appellate Court Caption | AMA REALTY GROUP OF ILLINOIS, an Illinois Limited Liability Company, Plaintiff-Appellant, v. MELVIN M. KAPLAN REALTY, INC., Defendant-Appellee. |
| District & No. | First District, Second Division<br>Docket No. 1-14-3600 |
| Filed<br>Rehearing denied | June 30, 2015<br>July 31, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-L-12019; the Hon. Margaret A. Brennan, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Voelker Litigation Group, of Chicago (Daniel J. Voelker and Alexander N. Loftus, of counsel), for appellant.<br><br>Sterling Law Office, of Chicago (Kevin A. Sterling and Laura Newcomer Cohen, of counsel), for appellee. |
| Panel | JUSTICE LIU delivered the judgment of the court, with opinion.<br>Presiding Justice Simon and Justice Neville concurred in the judgment and opinion. |

# OPINION

This dispute arises out of an exclusive listing agreement between plaintiff, AMA Realty Group of Illinois, LLC (AMA), and defendant, Melvin M. Kaplan Realty, Inc. (Kaplan), for the sale of a multi-unit apartment building that AMA owned. AMA filed this lawsuit, alleging slander of title, after Kaplan recorded a broker's lien against the property. Kaplan countersued, alleging that AMA breached the listing agreement by negotiating directly with the purchaser and subsequently concealing these negotiations. The circuit court granted summary judgment in favor of Kaplan on its counterclaim and denied AMA relief on the slander of title claim. AMA appeals from the order of summary judgment. We affirm.

## BACKGROUND

### A. The Listing Agreement

The facts of this case are largely undisputed. AMA and Kaplan were opposing parties in a previous lawsuit involving an unpaid sales commission. On January 26, 2009, as a settlement of that dispute, AMA and Kaplan entered into an exclusive listing agreement pursuant to which Kaplan agreed to market and sell the Rosenwald Apartments, a multi-unit building owned by AMA (the property).

The term of the listing agreement was one year, from January 26, 2009 to 11:59 p.m. on January 25, 2010. Pertinent to this appeal, the agreement provided as follows:

> "1. In consideration of the services to be performed by Melvin Kaplan Realty, Inc. (Brokerage Company, hereinafter referred to as 'Broker'), and the commissions to be paid by AMA Realty Group of Illinois, LLC ('Seller') the parties agree that Broker *shall have the exclusive right to market and sell Seller's property* upon the following terms and conditions:

> * * *

> 13. Seller agrees *to immediately refer* to Seller's Designated Agent, all prospective purchasers or brokers who contact Seller for *any* reason and to provide Seller's Designated Agent with their names and addresses." (Emphases added.)

Under the terms of the listing agreement, Kaplan was entitled to a (5%) commission on the gross sales price of any sale if, during the term of the agreement: (1) Kaplan "obtain[ed] an offer to purchase the property from a ready, willing, and able buyer at the marketing price [$11,700,000]" or (2) "[AMA] enter[ed] into a contract for the sale or exchange of the property at any price and upon any terms to which [AMA] consent[ed]."

### B. The Alleged Breach

In November 2009, Landwhite Development, LLC (Landwhite), contacted Kaplan and requested information about the property. On November 19, Bentzion Friedman, a sales broker for Kaplan, emailed a marketing package for the property to David Roos, a Landwhite member.

Sometime prior to the end of November, Landwhite scheduled a meeting with AMA for December 9. In his email to Alex Loyfman, a co-owner of AMA, Roos requested that Loyfman identify the representatives from AMA who would be attending the December 9 meeting, for

purposes of notifying the building's security in advance of the meeting. Loyfman responded by email, indicating that only he and his father, Michael, would be attending the meeting.

¶ 10    On December 3, Friedman contacted Roos, inquiring as to whether Landwhite still had any interest in the property. Roos told Friedman that Landwhite had already set up a meeting with AMA and that the Loyfmans would be the only AMA representatives at the meeting. As it turned out, neither the owners nor anyone else from AMA had informed Friedman or anyone else at Kaplan about the December 9 meeting. Nonetheless, Friedman attended the meeting between Landwhite and AMA on that date.

¶ 11    During the December 9 meeting, Landwhite made a verbal offer for $4 million for the property. AMA rejected this offer. After the meeting concluded, Alex Loyfman told Friedman that the meeting had been a "waste of time." Later that month, Friedman attempted to contact Landwhite about its interest in the property, but Landwhite never responded. When Friedman called Loyfman about Landwhite's interest in the property, Loyfman represented that he "[had not] heard anything from them." According to email communications in the record, Loyfman was, in fact, in continued contact with Landwhite regarding the sale of the property through January 12, 2010.

¶ 12    On January 20, Loyfman met with Roos and other Landwhite members to discuss the property. The following day, Loyfman told Friedman, via email, that there was nothing currently in place for the sale of the apartment. Loyfman also told Friedman to "let him know" if Kaplan "had anything on hand." Less than a week later, on January 25, Landwhite e-mailed AMA a draft purchase agreement with a price term totaling $6 million. The draft agreement for the purchase of the property was sent at around 8 p.m., shortly before the expiration of the listing agreement.

¶ 13    On February 12, AMA and Landwhite signed a purchase agreement for the property. Friedman was not told by anyone at Landwhite or AMA that the two parties had reached an agreement for the purchase of the property. Friedman did not even learn about the February 12 purchase agreement until July, five months later, when he read a newspaper article regarding the pending transaction.

¶ 14    Kaplan recorded a commercial real estate broker's lien on the property in August 2012. On January 28, 2013, the sale of the property closed for a final price of $6.75 million. AMA did not pay Kaplan or Friedman a commission following the closing on the sale of the property.

¶ 15    Prior to the closing, on October 22, 2012, AMA filed a complaint for slander of title. Kaplan countersued, alleging breach of contract, promissory estoppel, and *quantum meruit*.[1] Following discovery, Kaplan moved for summary judgment on its breach of contract claim, arguing that AMA violated the exclusive listing agreement by negotiating directly with Landwhite for the sale of the property and by failing to disclose these negotiations to Kaplan.

¶ 16    The circuit court ultimately granted summary judgment in favor of Kaplan on its breach of contract counterclaim and entered judgment against AMA on its slander of title claim. On October 31, 2014, the court awarded Kaplan a total of $486,898.51 in damages, fees, costs and prejudgment interest. AMA timely appealed. We thus have jurisdiction pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. May 30, 2008).

---

[1]AMA's motion to dismiss Kaplan's promissory estoppel and *quantum meruit* claims was granted by the trial court on May 29, 2013.

¶ 18      AMA argues that the court erred in granting summary judgment on Kaplan's breach of contract counterclaim, where AMA fulfilled all of its affirmative obligations under the listing agreement. Kaplan disagrees and maintains that AMA breached the parties' agreement not only when it deliberately excluded Kaplan from negotiations with Landwhite regarding the property, but also when it later attempted to conceal these ongoing negotiation efforts. Summary judgment is justified when "the pleadings, depositions and admissions on file, together with the affidavits, if any, show that there is no issue as to any material fact and that the moving party is entitled to judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2012). We review *de novo* an award of summary judgment. *Weather-Tite, Inc. v. University of St. Francis*, 233 Ill. 2d 385, 389 (2009) (citing *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008)).

¶ 19      The question we must resolve is whether AMA complied with the express terms of the listing agreement. Where the terms of a contract are not ambiguous, they "should generally be enforced as they appear" (*Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 479 (1998)), and will be given their plain, ordinary, and popular meaning (*Westlake Financial Group, Inc. v. CDH-Delnor Health System*, 2015 IL App (2d) 140589, ¶ 11 (citing *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011)). A contract is not considered to be ambiguous simply because the parties disagree on its meaning. *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill. 2d 141, 153 (2004). The construction of a contract presents a question of law subject to *de novo* review. *Gallagher v. Lenart*, 226 Ill. 2d 208, 219 (2007). Our primary objective in construing a contract "is to give effect to the intent of the parties" (*id.* at 232), and, in doing so, we must construe the contract as a whole, analyzing each provision in light of other provisions (*Westlake Financial Group, Inc.*, 2015 IL App (2d) 140589, ¶ 11 (citing *Thompson*, 241 Ill. 2d at 441)).

¶ 20      Neither party asserts that any terms in the listing agreement are ambiguous. Rather, each of the parties believes it has complied with all of the material terms. AMA contends that because Kaplan had knowledge of Landwhite and its interest in purchasing the property, AMA fulfilled its contractual duty to refer all interested purchasers to Kaplan. In defense of its independent negotiations with Landwhite, AMA argues that it was not required, under the terms of the listing agreement, to "refrain from communicating directly with prospective purchasers that [Kaplan] [was] already aware of." AMA also maintains that Kaplan is not entitled to a commission on the sale of the property because Kaplan failed to perform under the listing agreement by either: (1) bringing an offer to AMA for the market price of the property from a party ready to complete the purchase, or (2) ensuring the completion of a sale for the property during the term of the listing agreement.

¶ 21      Kaplan argues that, under the plain language of the agreement, AMA had no right to engage in negotiations or schedule meetings with prospective purchasers. Rather, AMA was permitted only to refer interested parties to Kaplan, which had the "exclusive right" to market and sell the property. According to Kaplan, because AMA negotiated with Landwhite during the exclusive listing period and concealed these dealings from Kaplan, AMA's conduct violated the listing agreement and constituted a breach of contract.

¶ 22      Following our review of the record, we find no error in the circuit court's award of summary judgment on Kaplan's breach of contract counterclaim. We construe the language of the listing agreement to mean that AMA was prohibited from negotiating directly with *any*

prospective purchaser, including Landwhite, regardless of whether Kaplan was actually responsible for originally introducing or procuring the prospect. It is plain from the unambiguous text of the agreement that AMA was obligated "to immediately refer" to Kaplan each prospect (or broker for the prospect) who contacted AMA "for *any* reason." (Emphasis added.) The agreement contains no exception for prospects "known" to Kaplan or the reasons for the contact.

¶ 23    We also observe that the listing agreement provides that Kaplan "shall have the exclusive right to market and sell [AMA's] property." The word "exclusive" means "limiting or limited to possession, control, or use by a single individual or group." Merriam-Webster's Collegiate Dictionary 436 (11th ed. 2006). Applying that definition here, we find that Kaplan was granted the sole right–to the exclusion of any other party *including* the owner of the property–"to market and sell" the property. The listing agreement further provides that AMA "agrees to immediately *refer* to [Kaplan], all prospective purchasers or brokers who contact [AMA] *for any reason* and to provide [Kaplan] with their names and addresses." (Emphases added.) "Refer," given its ordinary definition, means "to send or direct for treatment, *aid*, *information*, or decision." (Emphases added.) Merriam-Webster's Collegiate Dictionary 1045 (11th ed. 2006). Thus, AMA was contractually obligated to send and direct anyone who contacted it about the property–for any reason–to Kaplan. Read together, the foregoing provisions are subject to only one reasonable interpretation: Kaplan had the sole authority to communicate with potential buyers during the term of the listing agreement and AMA's role was simply to refer all inquiries from prospective purchasers to Kaplan. *Dowd & Dowd, Ltd.*, 181 Ill. 2d at 478 (holding that unambiguous terms should be read as they appear).

¶ 24    The record shows that, contrary to the terms of the listing agreement, AMA failed to refer Landwhite to Kaplan and elected, instead, to negotiate directly with Landwhite and attempt to exclude Kaplan from these negotiations. It is apparent that sometime before December 9, 2009, the date of the initial meeting between Landwhite and AMA, AMA began directly communicating with Landwhite to schedule the meeting. At that point, AMA had a duty to direct Landwhite to address all communications and inquiries, for "any" reason, to Kaplan or its agents. By not disclosing the December 9 meeting to Kaplan, AMA breached its duty.

¶ 25    Kaplan's attendance at the December 9 meeting, despite its lack of prior knowledge about the scheduled meeting, should have reminded AMA's representatives of their obligation to include Friedman or any other agents of Kaplan in further negotiations with any prospective purchaser, including Landwhite. This was not the case. Instead, the record shows that, subsequently, AMA failed to inform Kaplan about the e-mails exchanged with Landwhite, failed to inform Kaplan about the January 20, 2010 meeting with Landwhite, at which AMA anticipated an "LOI" (which we interpret to be a letter of intent for the purchase of the property), and failed to inform Kaplan that Landwhite offered to purchase the property for $6 million on January 25, 2010, the last effective day of the listing agreement.

¶ 26    We make no finding as to whether AMA's failure to include Kaplan in the negotiations was deliberate. The record, however, reveals a pattern of omission and nondisclosure by AMA about its communications with Landwhite from sometime prior to December 9, 2009 through January 25, 2010, the last effective date of the listing agreement. Even when the purchase agreement was signed by Landwhite and AMA in February 2010, AMA still did not notify Kaplan about the pending sale of the property. It appears that Landwhite also avoided any further communications with Kaplan after the December 9 meeting. However, Landwhite is

not bound to any of the terms of the listing agreement and owes no duty to Kaplan. Furthermore, it does not matter whether the discussions between AMA and Landwhite involved the purchase, lease or other conveyance of the property, or some other use of the property short of an acquisition. AMA had a duty to direct Landwhite to Kaplan for all such discussions, and implicit in that duty was the obligation to refrain from continuing its negotiations with Landwhite without Kaplan's participation or without informing Kaplan that it was engaged in such endeavors.

¶ 27 AMA would have us interpret the phrase "exclusive right" to mean that someone other than Kaplan had the ability to market and sell the property because "[the terms of the agreement] did not prohibit AMA from dealing directly with prospective purchasers that [Kaplan] was aware of." We cannot adopt such an interpretation, as it is not supported by the plain meaning of the term "exclusive" and would render the exclusivity and referral provisions of the listing agreement superfluous. *Westlake Financial Group, Inc.*, 2015 IL App (2d) 140589, ¶ 11 (citing *Thompson*, 241 Ill. 2d at 441).

¶ 28 We find *Gretencord v. Cryder*, 336 Ill. App. 3d 930 (2003), to be instructive. The *Gretencord* court held that when there is an exclusive listing agreement, a seller has a duty to refer all prospective buyers to his licensed broker. *Id*. at 934-35. In *Gretencord*, the defendant was a seller that had entered into a three-month exclusive listing agreement with the plaintiff-broker to sell his farm. *Id*. at 931. The listing agreement contained a provision that required the defendant to " 'immediately refer to the [plaintiff's agent] all prospective purchasers or brokers who contact [the defendant] for any reason and to provide the [plaintiff's agent] with their names and addresses.' " *Id*. at 932. During the term of this agreement, the plaintiff made contact with a third party that ultimately contacted the defendant directly and purchased the property. The plaintiff contended that he had not actively solicited the purchaser initially because he had been told by the defendant's attorney that the purchaser was not interested, and he had also been told by the purchaser himself that he could not afford the farm. *Id*. The defendant admitted that he failed to refer the purchaser to the plaintiff. *Id*. The *Gretencord* court held that the defendant breached his duty under the listing agreement and awarded the plaintiff relief, noting that the "defendant had only to refer [the purchaser] to [the plaintiff] and to provide [him] with [the purchaser's] name and address pursuant to *** the listing agreement. Defendant did neither." *Id*. at 934.

¶ 29 Here, similar to *Gretencord*, AMA had several occasions and opportunities to refer Landwhite to Kaplan or its agent, Friedman. There is no evidence, however, indicating that AMA attempted to reach Kaplan prior to any of the meetings it scheduled with Landwhite. Instead, AMA's owner told Kaplan's agent, immediately after the December 9, 2009 meeting, that the meeting had been a "waste of time." AMA then participated in a prearranged meeting with the purchaser on January 20, 2010, at which point AMA expected a written letter of intent concerning Landwhite's offer to purchase the property. However, the record shows that none of the AMA owners had invited Friedman to the meetings or informed him about them.

¶ 30 AMA argues that we should not apply *Gretencord* here because the record lacks proof of any collusion between AMA and Landwhite, and because there was no protection period in the listing agreement. These distinctions have no bearing on our decision, as the facts involving collusion and a protection period were not dispositive to the *Gretencord* court's holding. Moreover, any proof of intentional concealment or collusion would not impact or alter the elements of a breach of contract that Kaplan must establish in its counterclaim.

¶ 31    AMA further contends that because Kaplan knew of Landwhite and its interest in the property, it should have continued to negotiate with Landwhite despite being told that the December 9 meeting had been a "waste of time." This argument, like AMA's attempts to differentiate *Gretencord*, misses the mark. AMA had a duty to refer all prospective buyers to Kaplan regardless of whether Kaplan had any prior contact with the interested parties, and we note that the *Gretencord* court reached a similar conclusion based on analogous facts in the case. "Generally, the policy of the law is to protect a broker who has been employed and authorized to act and who, in good faith, has so acted." *Lyons v. Shane*, 133 Ill. App. 3d 820, 823 (1985). We therefore find that Kaplan was entitled to judgment as a matter of law on its breach of contract counterclaim and that the circuit court properly granted its motion for summary judgment.

¶ 32                                    CONCLUSION

¶ 33    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 34    Affirmed.